# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| NEIL WIEMAN, | ) | CASE NO. 3:22-CV-01045-JRK |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant, | ) | |
| | ) | |

## I. INTRODUCTION

Plaintiff Neil Anthony Wieman ("Mr. Wieman") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). (ECF Doc. 1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and it was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II. PROCEDURAL HISTORY

On October 15, 2015, Mr. Wieman filed an application for DIB, alleging a disability onset date of January 8, 2015. (Tr. 17, 384).[1] His application was denied initially and upon reconsideration. Mr. Wieman requested a hearing before an administrative law judge ("ALJ"). On November 29, 2017, ALJ Sher held a hearing. (Tr. 65). ALJ Sher issued an adverse decision on

---

[1] The transcript referred to in this Report and Recommendation is located at ECF Doc. 5 on CM/ECF.

1

April 3, 2018. (Tr. 130). Mr. Wieman appealed this decision to the Appeals Council, and the Appeals Council vacated the decision on October 9, 2019 and ordered a new administrative hearing before a different ALJ. (Tr. 171-73).

On May 18, 2021, ALJ Morrow (hereinafter the "ALJ") held another administrative hearing, during which Mr. Wieman, represented by counsel, and an impartial vocational expert testified (Tr. 17). On June 3, 2021, the ALJ issued a written decision finding Mr. Wieman was not disabled. (Tr. 30). The ALJ's decision became final on April 19, 2022, when the Appeals Council declined further review. (Tr. 1). Mr. Wieman asserts the following assignment of error in his merits brief:

1. The ALJ's decision is not supported by substantial evidence because the ALJ did not account for all of the credible opinions provided by the state agency reviewing psychologists.

(ECF Doc. 7, PageID#795).

### III. BACKGROUND INFORMATION

#### A. *Personal, Educational, and Vocational Experience*

Mr. Wieman was born in 1958, and he was 56 years old on the alleged onset date. (*See* Tr. 17, 43, 384). He is divorced, has two adult children, and lives with his friend. (Tr. 43-44). At the time of the hearing, he no longer possessed his driver's license due to a DUI incident in 2016. (Tr. 44). He has a ninth-grade education and obtained a GED. (Tr. 45). He did not complete any vocational training. (Tr. 45-46). His past relevant work was employment as a rubber cutter and injection molding machine operator. (Tr. 28).

#### B. *Relevant Hearing Testimony*

##### 1. **Mr. Wieman's Testimony**

The ALJ summarized Mr. Wieman's 2017 and 2021 administrative hearing testimony as follows:[2]

> At the hearing on November 29, 2017, the claimant reported that he suffered from anxiety and depression and at times felt like he was unable to do anything, for example, he could not catch his breath, he was unable to focus, and his thoughts would race. When he had anxiety attacks, his hands would tremble and due to depression, he always felt low. He said he did not always get out of bed during the day and did not always take a bath daily, but he did get dressed. He said he was able to prepare simple meals, do grocery shopping and laundry and left the house to go to the store or to see his therapist twice each month. He reported that medication for depression helped to take the edge off but made him drowsy. He said he did not visit with others very often due to a lack of transportation and living in the country. He did not think he would be able to do a job where he was sitting or standing and did not deal with people because he had difficulty focusing. When asked if he could do a job where he did the same thing all day long, he said he would not want to. He said he only slept about 4 hours each night and sometimes took naps during the day. He had crying spells all of the time in his 30's but now he only had them once in a while. He got along well with most people but chose to stay to himself and he said he never had problems with any of his bosses in the past. He said he spent his time watching television showed for 3-4 hours at a time. He reported that he had depression all of his life and when asked what changed that he could now no longer work, he said he had worsened anxiety that started a couple years ago. (Hearing testimony from November 29, 2017).
>
> At the hearing on May 18, 2021, the claimant alleged limitations resulting from mental health impairments that he states restrict his ability to work. He said he stopped working because his anxiety was too bad and he could not concentrate or keep track of things. He tried working again in 2020 but only worked for a few days and then was fired because he was not able to do good work. He said he saw a [p]sychiatrist every three months and medications that were prescribed were helpful to him. He used to participate in counselling but had not for a couple of years as he said he did not obtain benefit from it. He said he would sleep for 12 hours a day and did not take naps. He sometimes forgot to take his medications, a couple times each month, but he mostly remembered. He spent his day reading and said he got along okay with the friend who he lived with. He said at his last job, he only worked with one person but they got along okay with each other. He reported that he would drink a couple beers each day but he did not feel that this interfered with his work. He reported no problems walking or sitting and said he could stand for about 15 minutes and could lift 10-20 pounds. He was able to bathe, shower, and dress himself, prepare simple meals, clean up, and do laundry. He could use a cell phone or computer to access the internet and could do other household chores but he preferred not to. He said the last time he was admitted to inpatient

---

[2] Mr. Wieman's 2017 hearing testimony can be found from Tr. 71-97, and his 2021 hearing testimony can be found from Tr. 37-64.

> hospitalization due to his mental health impairments was in 2016 or 2017. He said he continued to have anxiety attacks and when these occurred, he would not be able to be around other people and he would have to leave his job due to phobia. His mood was down and he had days that he would not get out of bed and he would feel angry and irritable with himself. He had poor concentration and attention and would need to write things down and had to re-read things 3-4 times. Changes in a routine were difficult for him and when he was stressed he would take a walk or ride his bike. He had good and bad days and on the bad days, he would not want to do anything. (Hearing testimony).

(Tr. 24).

### 2. Vocational Expert's Testimony[3]

The VE testified that Mr. Wieman's past relevant work was employment as a roofer helper, rubber cutter, and plastic injection molder. (Tr. 99). The ALJ asked the VE to consider whether an individual with Mr. Wieman's age, education, and experience would be able to perform past work if that individual has a RFC for work at any exertional level; can understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production-rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact occasionally with supervisors and coworkers, but never with the general public. (Tr. 99-100). The VE opined this individual could not perform work as a plastic injection molder but could still perform work as a construction laborer roofer and rubber cutter. (Tr. 100). The VE also opined that this individual could perform the additional jobs of cleaner II (DOT #919.687-014), laundry worker I (DOT #361.684-014); and counter supply worker (DOT # 319.687-010). (*Id.*).

The ALJ asked the VE whether this individual could perform work if the individual would be consistently absent two days per month. (Tr. 101). The VE opined that this absence would be work-preclusive. The ALJ asked the VE whether an individual that would be consistently off task more than 15% of the workday would be able to perform past work. (*Id.*). The VE concluded that

---

[3] This summary will only discuss the VE's testimony from the 2021 administrative hearing.

this limitation also would be work-preclusive. (*Id.*). The VE stated that employers generally tolerate one to two absences per month during a probationary period of 30 to 60 days, but following that probationary period, missing even once consistently on an ongoing basis would result in a reprimand and/or termination. (*Id.*). The VE also stated that the on-task requirement for competitive work would be up to 85%, meaning that an unproductive eight minutes per hour or more would generally be work preclusive. (*Id.*).

Mr. Wieman's counsel asked whether the individual from the ALJ's hypothetical with the additional limitation of working jobs that only involve one- or two-step tasks would be able to perform past relevant work. (Tr. 102). The VE responded that she was uncertain because it would depend on how one would count a task. (*See id.*). Finally, Mr. Wieman's counsel asked whether the hypothetical individual who would react inappropriately to any sort of critical supervisory feedback and be unable to develop and maintain appropriate relationships with coworkers would be consistent with a limitation of occasional or less than occasional interaction. (Tr. 103). The VE opined that an individual with these limitations would not be capable of maintaining substantial gainful employment. (*Id.*).

### C. *Relevant State Agency Medical Opinions*[4]

#### 1. **Irma Johnston, PsyD**

Dr. Johnston determined that Mr. Wieman had social interaction limitations. Dr. Johnson opined that there is no evidence Mr. Wieman is limited in his ability to ask simple questions or request assistance. (Tr. 112). Dr. Johnston also opined that Mr. Wieman is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral

---

[4] Because the crux of Mr. Wieman's and the Commissioner's arguments revolve around the ALJ's adoption of the state agency consultants' opinions regarding Mr. Wieman's social interaction limitations, the summary is limited to those limitations. However, the full extent of his opined limitations can be located at Tr. 111-13 and Tr. 122-25.

extremes, and not significantly limited in his ability to interact appropriately with the general public. (*Id.*). Finally, Dr. Johnston found that Mr. Wieman was not significantly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*). Thus, Dr. Johnson concluded that Mr. Wieman should be limited to working superficially with others. (*Id.*).

### 2. Joseph Edwards PhD

Dr. Edwards opined that Mr. Wieman is moderately limited in his ability to interact appropriately with the general public; his ability to accept instructions and respond appropriately to criticism from supervisors; and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 124-25). Dr. Edwards found no evidence of a limitation in Mr. Wieman's ability to ask simple questions or request assistance. (Tr. 125). Finally, Dr. Edwards found that Mr. Wieman is not significantly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*). Dr. Edwards further explained that Mr. Wieman can handle working superficially with others. (*Id.*).

### D. *Relevant Medical Evidence*

The ALJ summarized the medical evidence as follows:

> Attention is first paid to the medical evidence of record and the objective medical evidence, evidence of treatment and the claimant's favorable response to treatment without significant side effects, and other evidence, including statements from the claimant, contained therein (20 CFR 404.1529(c)(3) and SSR 16-3p). He has treated medically and with therapy for bipolar II and anxiety disorders throughout the relevant period. As of February 2015, he was treating with Prozac, since which time his medications have been adjusted in type and dosage with good control of his symptoms (Exhibit 1F/26).
>
> He began treating with a mental health specialist in or around July 2015, at which time he reported constant worry about his financial situation, no motivation, insomnia, isolating behavior, and impaired concentration (Exhibit 2F/19). At that

6

time he was also using alcohol and stated that he was not interested in substance abuse treatment (and indeed, he continued to use alcohol and expressed no interest in treatment throughout much of the relevant period) (2F/11 and 19). On mental status examination at that time he presented as well-groomed, having a depressed mood, fully oriented, with normal insight and judgment, cooperative behavior, and impaired remote memory (2F/15).

Records from that source indicate that he was admitted to the hospital in August 2015 secondary to suicidal ideation and started on Lithium and Risperdal (Exhibit 2F/3). His medications were subsequently adjusted to include Buspar and Vistaril (2F/2). The claimant responded well to treatment, as shown by records of subsequent mental status examinations, in which he is consistently described as casually and appropriately to the weather; with good eye contact, good grooming and hygiene (occasionally impaired): as cooperative with the interview: with clear, coherent, and spontaneous speech: as alert and oriented: with fair attention and concentration: with average intelligence: and with intact memory (2F/1 and 5, 6F and 8F). In making this observation, the undersigned does note that these records also describe the claimant's mood as dysthymic, sad and/or anxious and affect as restricted, and his judgment and insight as poor (2F/1 and 5, 6F and 8F). Throughout this period the claimant describes his symptoms as waxing and waning. Of note, in February 2016 he denied any major depressive symptoms (2F/5). He did report increased depression and anxiety in April and May 2016, at which time he was started on Abilify with good relief as per his own report in July 2016. (Exhibit 6F).

In February 2017, the claimant reported that he had self-discontinued Prozac, despite which he reported more energy (Exhibit 8F/3). At that time, he also acknowledged that he had been working part-time in construction the past three months, working five to six hours a day, five days a week. He reported an improved mood and described his life as having "purpose". Although he did report increased depression in May 2017, he also reported that he was no longer working at that time (8F/4). Notably, his mental health care provider, Eddy Bruno, M.D., indicated at that time that his depression was possibly related to boredom. The claimant was started on Trintellix at this time (8F/4).

In May 2017, the claimant informed Dr. Bruno that he was no longer drinking alcohol or using marijuana (Exhibit 8F/4). In that time, his medications were further modified including with the discontinuation of Trintellix and addition of Escitalopram (8F/6). Notably, by August 2017 the claimant reported that he was not as depressed (8F/7). It is particularly notable that the claimant denied any major side effects at this time.

The claimant continued to treat at Westwood with Dr. Bruno and in October 2018 he reported he was sleeping 12-15 hours a day, probably due to boredom. He said he was anxious at times but denied feeling depressed. He said he had been fishing a few times this summer. (Exhibit 11F/98). Mental status examination showed he

7

had good eye contact, fair grooming and hygiene, and was cooperative with the interview. His speech was clear, mood was euthymic, and affect was restricted. He had no suicidal or homicidal ideation and no psychosis. He did not have any major mood swings, flight of ideas, or racing thoughts and his thought process was goal oriented. He had fair attention and concentration, memory appeared intact, intelligence appeared average, and judgment and insight were limited. (Id.). In April 2019, he reported he was slightly better with an increase in the dosage of Excitalopram. (11F/35). In June 2019, he reported that he used to get highs and was now just depressed daily. He had anxiety from time to time but not daily. He said he watched television, did yard work, and did chores and found these coping tasks to be helpful. (Exhibit 11F/6, 12-13). He said he felt his medications were working well but did report thoughts of self-harm the week prior to this appointment. (11F/15). Mental status examination showed the claimant was well groomed with a euthymic mood and appropriate affect; he had calm motor activity and normal speech; he had normal insight and judgment; thought process was intact and thought content was normal; memory was intact; estimated intelligence was below average; and his behavior was cooperative. (11F/16). Diagnosis was listed as bipolar II disorder, most recent episode depressive, in partial remission; alcohol use disorder, moderate; and unspecified anxiety disorder. (11F/17). CPST groups to increase socialization were recommended and the claimant declined. (11F/17). In July 2019, the claimant reported he was in very good spirits and was able to spend time with his son and family for a cookout the prior weekend. (11F/102).

(Tr. 25-26).

## IV. THE ALJ'S DECISION

In here June 3, 3021, decision, the ALJ made the following findings:[5]

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 8, 2015 through his date last insured of June 30, 2019 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: bipolar II disorder, anxiety disorder, and alcohol use disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

---

[5] The ALJ's findings are summarized.

8

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; and never be exposed to hazards such as moving machinery, unprotested heights, or occupational driving. He can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work). He can respond appropriately to occasional interaction with supervisors and coworkers, but should have no team or tandem work with co-workers and no interaction with the general public. He can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment. Any necessary changes need to occur infrequently and be easily explained.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [in 1958] and was 61 years old, which is defined as an individual closely approaching retirement age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 8, 2015, the alleged onset date, through June 30, 2019, the date last insured (20 CFR 404.1520(g)).

(Tr. 19-30).

V. **LAW AND ANALYSIS**

    A. *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r*

9

*of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

10

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B. *Standard for Disability*

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. *Persuasiveness of Opinions (Step Four)*

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but

generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[6] According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

### D. *Analysis*

In his single assignment of error, Mr. Wieman argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not account for all of the state psychologists' opinions. (*See* ECF Doc. 7, PageID#795, 799). While Mr. Wieman concedes that the ALJ adopted *most* of the state agency proposed social functioning limitations for Mr. Wieman, he argues that the ALJ failed to account for *all* of his credible social functioning limitations. (*Id.* at PageID#801). Specifically, Mr. Wieman asserts that the RFC does not accurately reflect the state agency psychologists' opinions regarding Mr. Wieman's limited ability to interact with others superficially. (*Id.* at PageID#802). Although the state agency psychologists opined that Mr. Wieman could only have "superficial" interaction with supervisors, coworkers, and the general public (Tr. 112, 124-25), Mr. Wieman argues that the ALJ omitted - without adequate explanation - this "superficial" interaction limitation and instead limited Mr. Wieman to "occasional" interaction. (*See* ECF Doc. 7, PageID#802). More specifically, he contends that the ALJ did not account for his social interaction limitations with his supervisors. (*See id.* at PageID#802-03). Mr.

---

[6] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

Wieman argues remand is warranted here because there is a "distinct difference" between occasional and superficial interaction. (*See id.*).

The ALJ stated the following regarding the persuasiveness of the state agency psychologists' opinions:

> As for the opinion evidence, in the psychiatric review, the state agency psychological consultants opined that the claimant had a mild limitation in understanding, remembering, or applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and no limitation in adapting or managing oneself. The claimant can handle simple and moderately complex tasks in a non-fast paced work environment. The claimant can handle working superficially with others. The claimant can handle working in an environment that is mostly static, with few changes. (Exhibits 1A & 3A and 4F & 5F). The undersigned has given this opinion some weight because although most of the limitations are supported by and consistent with the medical evidence of record; however, a moderate limitation in adapting and managing oneself is justified by the claimant's continued depressive symptoms even with medication. He reported increased sleep and lack of motivation to do things but said he could complete necessary tasks if he had to.

(Tr. 26).

The ALJ articulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes, or scaffolds; and never be exposed to hazards such as moving machinery, unprotested heights, or occupational driving. He can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work). He can respond appropriately to occasional interaction with supervisors and coworkers, but should have no team or tandem work with co-workers and no interaction with the general public. He can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment. Any necessary changes need to occur infrequently and be easily explained.

(Tr. 23).

When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive, even if this Court might reach a different

13

conclusion or if the evidence could have supported a different conclusion. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Mr. Wieman's assignment of error is not well-taken. As an initial matter, Mr. Wieman's reliance on a July 27, 2022, Appeals Council order is unavailing. (ECF Doc. 7, PageID#803). First, Mr. Wieman failed to attach the Appeals Council's order as an exhibit or provide a case citation to guide this Court's inquiry. As a result, I cannot determine that the Appeals Council's "cemented" position is that superficial interaction is materially different from occasional interaction. (*See generally* ECF Doc. 7).[7] More importantly, it would be improper for this Court to rely on this evidence. This Court's review is limited to evidence in the certified administrative record. 42 U.S.C. § 405(g); *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in [this] court.").[8] Because the Appeals Council's order is not part of the certified administrative record, this Report and Recommendation will not consider it..

Additionally, the Commissioner is correct in stating that the ALJ is not required to adopt the verbatim wording of an opined limitation in the RFC finding. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (An "ALJ is not required to recite the medical opinion of a

---

[7] And his factual assertions regarding what the Appeals Council found is not evidence. *See Duha v. Agrium*, 448 F.3d 867, 869 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence.").

[8] *See also Burks v. Comm'r of Soc. Sec.*, No. 1:21-cv-345, 2022 WL 17364887 (Oct. 20, 2022), *report and recommendation adopted*, 2023 WL 113629 (N.D. Ohio Jan. 25, 2023) (Grimes, M.J.) (declining to consider claimant's remand argument based of a newly submitted letter not in the certified administrative record because the "[c]ourt's review must focus on the administrative record filed with the [c]ourt").

physician verbatim in [her] residual capacity finding … [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."). Nor is an ALJ required to adopt all findings when crafting an RFC. *Fiktus v. Kihakazi*, No. 1:20CV1689, 2021 WL 5567866, at *9 (N.D. Ohio July 29, 2011) (citing *Poe*, 342 F. App'x at 157). But an ALJ is required to provide an explanation if the RFC conflicts with these findings. *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2841707, at *13 (N.D. Ohio Feb. 3, 2020); *see also Stoodt v. Comm'r of Soc. Sec.*, 2022 WL 721455, at *15 (N.D. Ohio Jan. 13, 2022).

The ALJ adopted limitations that accounted for the state agency's qualitative "superficial interaction" limitation. The ALJ first limited Mr. Wieman to "no interaction with the general public." (Tr. 23). She also limited Mr. Wieman to "occasional interaction with supervisors and co-workers, but [he] should have no team or tandem work with co-workers[.]" (*Id.*). Mr. Wieman correctly asserts that "occasional" is a Social Security term that deals with the quantity of interaction rather than the quality of interaction. (*See* ECF Doc. 7, PageID#802). However, the Court agrees with the Commissioner that the ALJ's restriction prohibiting Mr. Wieman from "team or tandem tasks with coworkers" accounts for the qualitative nature of a social interaction. An ALJ is not required to provide a verbatim recitation of the state agency expert's recommended restriction, and courts have found that a no team or tandem tasks limitation accounts for an opined "superficial interaction" limitation. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (noting that an ALJ is not required to adopt each restriction of an expert to which she gave great weight); *Hines v. Comm'r of Soc. Sec.*, No. 3:20-cv-620, 2021 WL 1571659, at *3 (N.D. Ohio Apr. 22, 2021), *report and recommendation adopted*, 2020 WL 2839654 (N.D. Ohio June 1, 2020) ("Courts have found that a 'limitation to no tandem tasks is a qualitative limitation on social

15

interaction,' which 'adequately addresse[s] [the administrative findings] that Plaintiff be limited to superficial interaction with others.'") (citing *Kearns*, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020); *Romo v. Comm'r of Soc. Sec.*, No. 3:20-CV-01447-JGC, 2021 WL 5040385, at *7 (N.D. Ohio July 9, 2021) ("Here, since the ALJ limited Claimant to 'no tandem work', such a limitation prevents him from working alongside coworkers and supervisors. It logically follows then that the only interaction that Claimant would have with his coworkers and supervisors would be superficial.").

Moreover, reading this decision as a whole, the ALJ adequately explained her reasoning for the limitation regarding Mr. Wieman's interactions with his co-workers and supervisors. Specifically, at the conclusion of the ALJ's RFC assessment, the ALJ stated that Mr. Wieman's complaints "have not been completely dismissed, but rather, have been included in the residual functional capacity assessment, to the extent that they are consistent with the evidence as a whole." (Tr. 28). The ALJ stated that Mr. Wieman's moderate social difficulties supported the limitations of occasional interaction with supervisors and co-workers, no interaction with the general public, and no team and tandem work with co-workers. (*Id.*). Earlier in the decision, the ALJ discussed these difficulties when she opined that Mr. Wieman had moderate limitations in his mental functioning in interacting with others. (Tr. 21). The ALJ noted that, at a consultative examination with Dr. Ward, Mr. Wieman described a history of difficulty managing relationships with supervisors and co-workers and the potential impacts of mental health problems on his work performance that may lead to emotional instability when presented with critical supervisory feedback and difficulty developing and maintaining appropriate co-worker relationships. (Tr. 21, 585). But the ALJ also pointed to an early July 2019 examination where Mr. Wieman reported that he was able to spend time with his son and family for a cookout. (Tr. 722). Based on this (and

16

other evidence), the ALJ concluded that Mr. Wieman had moderate social difficulties. (*See generally* Tr. 28).

Further, the ALJ also addressed Mr. Wieman's reports regarding his relationships with supervisors and co-workers when evaluating the persuasiveness of Dr. Ward's opinion. (Tr. 27 (citing Tr. 585)). Specifically, the ALJ noted that Mr. Ward described difficulty managing relationships with his supervisors and co-workers. However, the ALJ stated that Dr. Ward based his medical opinion partially on information provided by Mr. Wieman, which even Dr. Ward noted was different from the information Mr. Wieman supplied to the Social Security Administration in his written responses to his questionnaires. (*Id.*). Significantly, the ALJ pointed to Mr. Wieman's statements in his written function report that he "can get along with most people" and denied having been fired or laid off from a job due to problems getting along with other people. (Tr. 27, 458). Reading this decision as a whole, the ALJ presented sufficient reasons for why she limited Mr. Wieman to occasional interaction with his supervisors and co-workers, no interaction with the general public, and no team or tandem tasks with co-workers.

In sum, I find that the ALJ properly explained her RFC limitations and accounted for the state agency opinions, including the "superficial interaction" restrictions. Accordingly, I find Mr. Wieman's assignment of error is without merit.

VI. **RECOMMENDATION**

Based on the foregoing, I RECOMMEND that the Court OVERRULE Mr. Wieman's assignment of error and AFFIRM the Commissioner's decision.

Dated: May 2, 2023

*s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
United States Magistrate Judge

VII. **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

17

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018)

(quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).